*1475 OPINION
By the Court,
Rose, J.:
This is an appeal and cross-appeal from a judgment against the Dow Chemical Company (“Dow Chemical”) for fraud and negligence in connection with alleged defects in silicone gel breast implants manufactured by Dow Corning Corporation (“Dow Corning”).[1]
The issues before this court are whether substantial evidence in the record supports the jury verdict and whether a new trial was warranted based on numerous alleged trial errors. We conclude that the verdict in this case cannot stand as to the fraud and accessory liability claims. We also conclude, however, that the verdict as to the negligence claim is supported by substantial evidence. Accordingly, we reverse the district court’s judgment in part and affirm it in part. In addition, we conclude that the district court did not abuse its discretion in denying Dow Chemical’s new trial motion.
I. Background
In 1943, Dow Chemical and Corning Incorporated formed Dow Corning for the express purpose of developing commercial and industrial uses for silicone technology. Dow Chemical and Corning Incorporated were, and continue to be, Dow Coming’s only stockholders, each owning fifty percent of Dow Coming’s stock. Dow Chemical and Corning Incorporated each also initially occupied four of ten seats on Dow Coming’s board of directors; later, each parent held five seats out of fifteen.
In 1948, Dr. V. K. Rowe, a toxicologist at Dow Chemical, coauthored an article entitled “Toxicological Studies on Certain Commercial Silicone,” which was published in the Journal of Industrial Hygiene and Toxicology. The article, while addressing the hazards surrounding the workplace handling of silicone, concluded that commercial silicone as a group were physically “inert” and were very low in toxicity.
*1476 From the 1940s until the 1970s, “every organosilicon compound’ ’ made by Dow Corning was sent to Dow Chemical for toxicological testing. While the majority of these tests concerned industrial handling hazards associated with the tested substances, Dow Chemical reports periodically advised Dow Corning on adequate product warnings or on the need for further testing before marketing a particular product. The products containing such silicone ingredients included cosmetics, bathroom caulk, hair conditioner, and foot ointment.
In 1956, Dow Corning commissioned a study co-authored by Dow Chemical employee M. B. Chenoweth entitled “The Physiological Assimilation of Dow Corning 200 Fluid” (“the Chenoweth study”). This study, in its introductory paragraph, noted that prior Dow Chemical experiments had shown that many silicone were inert, and that the increasing use of silicone for medicinal purposes had triggered a need for information on their biological ramifications. The study further revealed that Dow Corning 200 fluid (“DC 200”), when injected intramuscularly in rats and administered orally in dogs, had migrated to all major organs of the body, including the brain. (DC 200 fluid is chemically equivalent to the Dow Corning 360 fluid (“DC 360”) used in the breast implants at issue in this case.) This study was not published to the medical or scientific community.
In 1957, Dow Corning requested Dr. Rowe to set up a study on six silicone materials submitted by Dow Corning. Dr. Rowe arranged for the study (“the Miami study”) to be performed by a professor of pharmacology at the University of Miami School of Medicine, Dr. William Deichmann. Although Dr. Deichmann performed the testing, Dr. Rowe designed the testing protocol for the research (i.e., the number and type of test animals, the duration of the test, and the test methods).
Two versions of the Miami study were prepared by Professor Deichmann for Dow Corning on the same date. The first, entitled “Six Silicone Materials,” reported that six silicone compounds (the first five of which were different concentrations of DC 200 and the sixth, a substance identified as “Z-4141”) that were fed to male and female rats resulted in no deleterious effects, with the following exceptions: (1) all six compounds reduced the number of granulocytic (white blood) cells in the peripheral blood of female rats, (2) the livers of all the rats fed the sixth compound (Z-4141) were significantly heavier than those of the control rats, and (3) the sixth compound induced a fatty infiltration or degeneration in the liver. The second version of the study, entitled “Five Silicone Materials,” omitted all references to the sixth compound and its effects. The second version also explained that initial testing had suggested a depression in the number of leuko *1477 cytes (white blood cells) in all female rats over a period of 90 days, but that subsequent work on control animals showed that silicone was not the cause of the decrease.
In 1959, Dow Corning established the non-profit Center for Aid to Medical Research, which provided the medical community with medical products and research regarding the uses of silicone for medical applications. In the early 1960s, Dr. Thomas Cronin, a plastic surgeon and researcher from Baylor University, approached Dow Corning about the possibility of using silicone in breast implants. In 1962, Dow Corning commenced clinical trials on silicone breast implants. Dow Corning sold $93,000.00 worth of breast implants in 1962.[2]
In 1964, Dow Corning formed its Medical Products Division. Also in 1964, Dow Chemical acquired a substantial interest in Gruppo Lepetit, an Italian pharmaceutical company that had, in some foreign countries, an exclusive distribution agreement with Dow Corning to market Dow Coming’s medical line, including its breast implants. Lepetit sold Dow Corning breast implants outside the United States throughout Europe, South America, and Australia.
From its inception, Dow Corning has enjoyed physical proximity with Dow Chemical, being located just “across the road and down the way” in Midland, Michigan. In 1965, Dow Corning created a Bioscience Research Department to explore the potential biological activities of organosilicon compounds. The department was housed in the same building as Dow Chemical’s toxicology and research laboratories until 1970. Until 1968, Dow Corning lacked its own toxicology laboratory and staff and relied on outside contract laboratories, such as Dow Chemical, for toxicological testing and information. Dow Corning scientists often sought input from Dr. Rowe and other Dow Chemical scientists regarding silicone technology and toxicological effects. In 1968, Dow Corning established its own toxicology laboratory, but for the first two years, it shared the same building as Dow Chemical’s toxicology laboratory. Dow Corning continued thereafter to share laboratory facilities and animals with Dow Chemical, and its scientists continued to consult with Dow Chemical personnel regarding toxicological research. From 1968 until 1973, Dow Coming’s new toxicology laboratory and staff were headed by a former Dow Chemical toxicologist, Kenneth Olson. In 1973, Olson returned to work for Dow Chemical; Olson testified that in his capacity as the chief toxicologist for Dow Corning, he likely knew that Dow *1478 Coming’s breast implants contained silicone fluid as a component.
Dow Chemical was not the sole testing facility doing research for Dow Corning. Between 1964 and 1976, Dow Corning commissioned outside laboratories, often those recommended by Dow Chemical, to conduct animal testing and long-term studies on breast implants and other silicone products. In 1967, Dow Corning entered into a joint research and development agreement with Dow Chemical “relating to the physiological effects resulting from ingestion or injection into the systems of animals or men of particular physiologically active silicone.” The two companies also agreed to “jointly share the costs and . . . share the profits and losses of any commercialization.”
Also in 1967, Dow Corning implemented a two-year study on miniature Silastic breast implants in dogs, conducted by an outside laboratory, the Food and Drug Research Laboratories, Incorporated (“FDRL”). An internal Dow Corning memorandum in 1967 referenced that Dr. Rowe was one of the consultants who recommended this study. Although the study appears to have been principally designed by FDRL, part of the testing protocol may have involved Dr. Rowe.
In 1970, Dow Corning enlisted Dow Chemical to conduct a pathology test on the biological effects of DC 360 fluid. Gary Sparschu, a Dow Chemical research pathologist, reported to Dow Corning that the tests showed the liquid silicone had migrated to major organs of the test animals, including the bone marrow, and that the fluid had decreased the brain weights of female rats in two test groups. This information was not shared with the scientific or medical community.
In 1975, Dow Chemical and Dow Corning entered into a trademark agreement wherein Dow Chemical granted Dow Corning the right to use its trade name “Dow” and trademark. In return, Dow Chemical obtained the right to inspect Dow Coming’s manufacturing processes to assure the quality of its products and to approve or disapprove any products manufactured, distributed or sold under the Dow Chemical trademark. This agreement also stated that ‘ ‘Dow Company and Corning Company formed [Dow Corning] in 1943 and since then have continuously owned or controlled equally all of the issued share capital of [Dow Corning], and have controlled its operations, including the quality of its goods and services.”
Although Dow Corning began selling breast implants in 1962, the record is unclear as to the identity of the silicone fluid used in this early prototype. Dow Corning introduced the Silastic I breast implant, containing DC 360 fluid, in 1975 and the Silastic II breast implant, at issue in this case, in 1982. The Silastic II *1479 breast implant was marketed solely under Dow Coming’s trademark and trade name, not Dow Chemical’s.
In 1991, the United States Food and Drug Administration (“FDA”) conducted a premarket approval program for all manufacturers who wished to continue marketing and distributing silicone gel implants. Dow Corning submitted its premarket approval application to the FDA. Subsequently, the FDA suspended the use of silicone gel implants for cosmetic or augmentation purposes because of concerns about their safety, and limited their use to urgent medical situations or limited clinical trials.
II. Facts and Procedural History
The matter at bar is one of many cases pending across the country wherein breast implant recipients have sued Dow Chemical alleging that it is legally responsible for defects in Dow Coming’s silicone breast implants.
In August 1985, as part of reconstructive surgery following a bilateral subcutaneous mastectomy, Charlotte Mahlum elected to receive silicone gel breast prostheses (hereinafter “breast implants”). Dow Corning manufactured the two Silastic II breast implants that Mahlum’s surgeon implanted. The Silastic II implant is made up of several components. A clear outer shell of silicone rubber called an elastomer contains the silicone gel and is the protective barrier between the gel and the implant host. The silicone gel itself is comprised of eighty to eighty-five percent DC 360 silicone fluid.
In 1990, Mahlum’s health began to deteriorate. In July 1993, one of Mahlum’s breast implants ruptured, requiring the surgical removal of both implants. The surgeon was unable to remove all of the silicone gel from Mahlum’s body, leaving approximately ten percent of the silicone materials embedded in muscle, tissue, and blood vessels under her arms and ribs. Mahlum’s health continued to deteriorate after the explantation surgery.
In September 1993, Mahlum and her husband, Marvin Mahlum, filed suit against Dow Corning, Dow Chemical, and a number of other defendants, alleging that she had contracted an atypical autoimmune disease as a result of the rupture of one of her Silastic II breast implants. On May 15, 1995, Dow Corning petitioned for bankruptcy protection. In July 1995, the district court granted the Mahlums’ motion to sever their claims against Dow Corning. (All defendants other than Dow Corning and Dow Chemical were dismissed prior to Dow Coming’s bankruptcy.) In October 1995, the Mahlums proceeded to trial solely against Dow Chemical.
At trial, the Mahlums sought to prove that Dow Chemical, by contributing technology and expertise at the time of Dow *1480 Coming’s formation and by subsequently conducting or participating in testing of silicone products and materials, should be subject to direct causes of action with respect to products manufactured and distributed by Dow Corning. Specifically, the Mahlums alleged that Dow Chemical could be found directly liable for fraudulently concealing information about the dangers of silicone, conspiring with Dow Corning to effectuate such fraudulent concealment, aiding and abetting Dow Coming’s fraudulent misrepresentations about silicone safety, acting in concert with Dow Corning to effectuate such fraudulent misrepresentation, and negligently performing an undertaking — testing the toxicity of liquid silicone — for Dow Corning. All of the Mahlums’ tort claims were based, ultimately, on the assumption that Mahlum’s injuries were proximately caused by defective silicone breast implants.
After a four-week trial, the jury returned a verdict against Dow Chemical on the claims of (1) fraudulent concealment, (2) aiding and abetting Dow Coming’s fraudulent misrepresentation, (3) acting in concert with Dow Corning to commit fraudulent misrepresentation, and (4) negligent performance of an undertaking. The jury found in favor of Dow Chemical on the claim of conspiracy to commit fraudulent misrepresentation. The jury awarded Charlotte Mahlum $38,654.00 in past damages and $3,915,000.00 in future damages, and awarded Marvin Mahlum $200,000.00 in future damages. The jury also awarded the Mahlums $10,000,000.00 in punitive damages.
After judgment was entered on November 7, 1995, Dow Chemical filed a timely motion for judgment notwithstanding the verdict or, in the alternative, a new trial. On February 21, 1996, the district court denied these alternative motions.
Dow Chemical timely appealed to this court, challenging the judgment of the district court, and the district court’s denial of its motion for a new trial. Specifically, Dow Chemical argues that (1) it is entitled to reversal of the Mahlums’ judgment against it for fraudulent concealment, aiding and abetting Dow Corning, acting in concert with Dow Corning, and negligent performance of an undertaking, or, in the alternative, (2) a new trial is warranted as a result of numerous trial errors, including allegedly erroneous evidentiary rulings, improper jury instructions, and attorney misconduct. As an additional ground for new trial, Dow Chemical also argues that the compensatory damages award is excessive, and that the punitive damages award is constitutionally excessive.
Having considered the parties’ appellate briefs, the amicus briefs, and the voluminous record, and having heard oral argument, we conclude that the judgment against Dow Chemical is infirm as to the intentional tort claims. Accordingly, we reverse the judgment against Dow Chemical on those claims. However, *1481 we also conclude that substantial evidence in the record supports the judgment against Dow Chemical on the claim of negligent performance of an undertaking. Finally, we conclude that the district court did not err in denying Dow Chemical’s motion for a new trial.
III. Discussion
A. Standard of review
In general, the jury’s findings will be affirmed on appeal if they are based upon substantial evidence in the record. Prabhu v. Levine, 112 Nev. 1538, 1543, 930 P.2d 103, 107 (1996). “Substantial evidence has been defined as that which ‘a reasonable mind might accept as adequate to support a conclusion.’ ’ ’ Id. (quoting State, Emp. Security v. Hilton Hotels, 102 Nev. 606, 608, 729 P.2d 497, 498 (1986)).
B. Causation
The Mahlums had to show that Dow Corning was negligent or manufactured unsafe, defective breast implants before showing that Dow Chemical was liable in conjunction with Dow Corning. The Mahlums pleaded both negligence and strict liability against Dow Corning, and under either theory they were obligated to demonstrate causation. See Price v. Blaine Kern Artista, Inc., 111 Nev. 515, 518, 893 P.2d 367, 369 (1995) (causation is germane to both negligence and strict tort liability). Causation consists of two components: actual cause and proximate cause. See Sims v. General Telephone & Electric, 107 Nev. 516, 815 P.2d 151 (1991). To demonstrate actual cause with respect to Dow Coming’s product, the Mahlums had to prove that, but for the breast implants, Charlotte Mahlum’s illnesses would not have occurred. Id. at 524, 815 P.2d at 156. The second component, proximate cause, is essentially a policy consideration that limits a defendant’s liability to foreseeable consequences that have a reasonably close connection with both the defendant’s conduct and the harm which that conduct created. Id.
We conclude that the Mahlums introduced substantial evidence that Dow Coming’s defective breast implants caused her illnesses. The evidence demonstrated that Mahlum developed myriad illnesses following breast implant surgery. Silicone gel probably bled from the breast implants shortly after implantation, and Mahlum’s left breast implant later ruptured and spilled silicone gel into her body. The explantation surgeon was unable to remove *1482 all of the silicone gel from Mahlum’s chest, and left approximately ten percent of the silicone imbedded in muscle, tissue and blood vessels under her arms and ribs. Mahlum’s health continued to deteriorate after the explantation surgery. By 1995, Mahlum experienced shaking spells, itching, tingling in her hands and feet, slurring of her speech, seizures, discoloration in her hands and legs, headaches, dry eyes, loss of hair, memory loss, sleeplessness, pain in her joints, armpits and chest, and loss of coordination. Later, she increasingly lost control of her muscles.
The Mahlums provided causation evidence in the form of expert testimony. Expert testimony is admissible if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue. NRS 50.275. Demonstrating causation in cases involving medical products often requires expert medical testimony. See Prabhu, 112 Nev. at 1544, 930 P.2d at 108 (proof of causation in medical malpractice cases may be proved by expert testimony). Once the district court certifies an expert as qualified, the expert may testify to all matters within the expert’s experience or training. See Fernandez v. Admirand, 108 Nev. 963, 969, 843 P.2d 354, 358 (1992). Here, the district court properly exercised its discretion to qualify several physicians as the Mahlums’ expert witnesses to testify on the subject of her injuries and whether Dow Coming’s implants caused those injuries.[3]
The Mahlums adduced sufficient evidence at trial for a jury to decide that Dow Coming’s breast implants actually caused Mahlum’s injuries. The trial evidence was substantial in showing that Mahlum’s current health problems manifested themselves around the time the left breast implant ruptured and released its silicone gel into her body. Three expert witnesses, all board-certified medical doctors, including Mahlum’s treating rheumatologist, testified that Mahlum’s injuries were caused by her implants.
For example, Dr. Eric Gershwin, an immunologist from the University of California, Davis, and author of a_ number of articles about silicone and the immune system, testified that liquid *1483 silicone impairs the body’s immune system. Liquid silicone, he testified, causes the body to create autoantibodies that attack the body’s own organs and tissues. In essence, autoantibodies cause the human body to turn on itself. When silicone bleeds from the breast implant, it can enter the lymph nodes and from there travel to other organs, including the heart, the lungs, the nerves, and the brain. The lymph nodes try to cleanse the body of silicone oil, but cannot. Dr. Gershwin examined Charlotte Mahlum and testified that in her case, silicone had reached and reacted with her brain, demonstrated by an MRI (magnetic resonance imaging) of her brain that shows certain “punched-out” lesions. He also opined that silicone has damaged Mahlum’s nerves and nerve sheaths (demyelinization), resulting in nerve disfunction. Mahlum also had increased levels of anti-GM-1 antibody, which Dr. Gershwin had seen in other women with silicone gel breast implants. In Dr. Gershwin’s opinion, Mahlum suffered from a multiple-sclerosis-like disease and progressive dysfunction of the nerves, resulting from exposure to silicone. Mahlum also displayed many symptoms that other women with autoimmune diseases and silicone breast implants experience, including livedo reticularis (blotching of the skin), sicca symptoms (dryness of the eyes and mouth), aching muscles and joints, fatigue, loss of hair, memory problems, numbness, tremors, and seizures.
Dr. John Monroe Eaton, Charlotte Mahlum’s treating neurologist, echoed many of Dr. Gershwin’s conclusions, although he did not provide specific testimony that silicone caused Malhum’s illnesses. Dr. Eaton testified that Mahlum’s symptoms corresponded to multiple-sclerosis-like autoimmune disease, axonal neuropathy, and demyelinization, all of which are caused by antibodies attacking her nervous system. He testified that the axon is like a wire that connects the brain to other parts of the body, and the myelin is the sheath around the nerve itself, like insulation around a wire. When the axon or the myelin is disturbed, many problems can occur, including loss of sensation/numbness, livedo reticularis, loss of muscle control, dryness of the eyes and mouth, shrinking muscles, and chorea (twitching). As previously noted, Charlotte Mahlum displayed these symptoms. Dr. Eaton further testified to Mahlum’s raised antibody count, in addition to a “crawling” sensation under the skin that appears to be related to the nerve damage she had experienced. A majority of other silicone breast implant patients Eaton has treated experienced similar nervous system disorders and autoimmune diseases.
Dr. Steven Atcheson, a rheumatologist, observed Mahlum’s symptoms and, based on his training and experience in treating over one hundred women who had silicone gel breast implants, concluded that the symptoms were caused in large part by expo *1484 sure to silicone. Atcheson testified that women with breast implants displayed symptoms of fatigue, joint and muscle pain, sleep disturbances, hair loss, skin rashes, dryness of the eyes and mouth, and numbness or tingling in their hands and feet. These symptoms are part of what he terms “atypical autoimmune disease,” which he believes can be caused by silicone gel breast implants. He has treated Charlotte Mahlum, and he noted that she shares many of the same symptoms as other women who have silicone gel breast implants.
Based upon the evidence discussed above, a reasonable jury could conclude that but for the breast implants, Mahlum would not have suffered from myriad illnesses.
Next, the Mahlums adequately demonstrated that Charlotte Mahlum’s injuries were a foreseeable result of Dow Coming’s sale of these products. Prior tests of DC 200 (chemically equivalent to DC 360 as used in Dow Coming’s Silastic II breast implants) illustrated that silicone will migrate throughout a person’s body, ultimately residing in various major organs and tissues, including the brain. Subcutaneous injections of DC 200 in rabbits showed inflammation at the injection sites after twenty-four hours. Tests of DC 200 on calf hides indicated damage to the calf hide after ten days. A test on DC 360 suggested that it decreased the white blood cell counts and changed liver and brain weights in rats. Evidence showed that Dow Corning was aware that the envelope containing the silicone gel had a tendency to bleed silicone into the patient’s breast area. In light of the foregoing knowledge, it was foreseeable that the silicone used in breast implants was probably harmful to women.
Although Dow Chemical disputes the conclusions of the Mahlums’ experts, the jury was entitled to rely on their testimony. This court has long adhered to the rule that when there is a conflict in the evidence, the verdict or decision will not be disturbed on appeal. See, e.g., Frances v. Plaza Pacific Equities, 109 Nev. 91, 94, 847 P.2d 722, 724 (1993). Stated differently, a jury’s verdict will not be overturned if it is supported by substantial evidence unless the verdict was clearly erroneous when viewed in light of all the evidence presented. Bally’s Employees’ Credit Union v. Wallen, 105 Nev. 553, 779 P.2d 956 (1989). This verdict was not clearly erroneous and is supported by substantial evidence that Dow Corning breast implants caused Mahlum’s illnesses.
We are aware that causation is a scientifically controversial component of the plaintiff’s case in breast implant litigation. The *1485 Mahlums, however, did not need to wait until the scientific community developed a consensus that breast implants caused her diseases. If she had, it might have been too late to recover, in light of the doctrine of laches and statutes of limitation and repose. The Mahlums’ complaint was not tried in the court of scientific opinion, but before a jury of her peers who considered the evidence and concluded that Dow Corning silicone gel breast implants caused her injuries. The jury in this case was properly instructed to consider the proof by a preponderance of the evidence. There is no evidence that the jury did otherwise. Science may properly require a higher standard of proof before declaring the truth, but that standard did not guide the jury, nor do we use that standard to evaluate the judgment on appeal.[4] For the foregoing reasons, we therefore conclude that the Mahlums provided substantial evidence on the issue of causation.
C. Fraudulent Concealment
The jury found that Dow Chemical had fraudulently concealed the dangers of liquid silicone from Mahlum. To establish a prima facie case of fraudulent concealment, a plaintiff must offer proof that satisfies five elements: (1) the defendant concealed or suppressed a material fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant intentionally concealed or suppressed the fact with the intent to defraud the plaintiff; that is, the defendant concealed or suppressed the fact for the purpose of inducing the plaintiff to act differently than she would have if she had known the fact; (4) the plaintiff was unaware of the fact and would have acted differently if she had known of the concealed or suppressed fact; (5) and, as a result of the concealment or suppression of the fact, the plaintiff sustained damages. See Nevada Power Co. v. Monsanto Co., 891 F. Supp. 1406, 1415 (D. Nev. 1995).
The Mahlums alleged that Dow Chemical fraudulently and intentionally concealed the hazards of liquid silicone after it had “partially assumed” Dow Coming’s duty to perform toxicological testing on liquid silicone. As a result, the Mahlums charged Dow Chemical with a duty to disclose publicly the alleged dangers of silicone implants because: it asserted long ago in published articles (e.g., Dr. Rowe’s 1948 study, the 1956 Chenoweth study) *1486 that silicone as a class were inert; after performing toxicological testing on silicone for Dow Corning, Dow Chemical subsequently learned that certain silicone polymers were not inert; and Dow Chemical possessed superior knowledge about silicone safety yet, according to the Mahlums, it actively and intentionally suppressed this knowledge. The Mahlums also asserted that had Charlotte Mahlum been aware of the fraudulently concealed information, she would not have chosen to undergo the breast implantation surgery that caused her injuries.
Generally, an action in deceit will not lie for nondisclosure. Epperson v. Roloff, 102 Nev. 206, 213, 719 P.2d 799, 803 (1986). For a mere omission to constitute actionable fraud, a plaintiff must first demonstrate that the defendant had a duty to disclose the fact at issue. See Monsanto, 891 F. Supp. at 1417. Here, absent such a duty, Dow Chemical’s failure to disclose any information it may have had about the adverse effects of liquid silicone and/or silicone breast implants would not constitute actionable fraud.
With respect to fraudulent concealment, a duty to disclose arises from the relationship of the parties. A fiduciary relationship, for instance, gives rise to a duty of disclosure. See, e.g., Foley v. Morse & Mowbray, 109 Nev. 116, 125-26, 848 P.2d 519, 525 (1993). A duty to disclose may also arise where the parties enjoy a “special relationship,” that is, where a party reasonably imparts special confidence in the defendant and the defendant would reasonably know of this confidence. See Mackintosh v. Jack Matthews & Co., 109 Nev. 628, 634-35, 855 P.2d 549, 553 (1993) (citing Mancini v. Gorick, 536 N.E.2d 8, 10 (Ohio Ct. App. 1987)). A party’s superior knowledge thus imposes a duty to speak in certain transactions, depending on the parties’ relationship. “Nondisclosure will become the equivalent of fraudulent concealment when it becomes the duty of a person to speak in order that the party with whom he is dealing may be placed on an equal footing with him.” Mackintosh, 109 Nev. at 634-35, 855 P.2d at 553 (quoting Mancini, 536 N.E.2d at 9-10). Even when the parties are dealing at arm’s length, a duty to disclose may arise from “the existence of material facts peculiarly within the knowledge of the party sought to be charged and not within the fair and reasonable reach of the other party.” Villalon v. Bowen, 70 Nev. 456, 467-68, 273 P.2d 409, 415 (1954) (failure of purported widow to tell the executor of her purported husband’s estate that her prior marriage had not been terminated).
*1487 The duty to disclose requires, at a minimum, some form of relationship between the parties. See Mackintosh, 109 Nev. at 634-35, 855 P.2d at 553 (disclosure mandated in context of dealings between parties); Villalon, 70 Nev. at 467-68, 273 P.2d at 415 (same); see also In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig., 113 F.3d 1484, 1497 (8th Cir. 1997) [hereinafter TMJ Implants] (without some kind of relationship, there can be no duty to disclose). Absent such a relationship, no duty to disclose arises, and as a result, no liability for fraudulent concealment attaches to the nondisclosing party.
It is undisputed that Dow Chemical did not have a fiduciary relationship, a special relationship, or a relationship of any kind with the Mahlums. Instead, the Mahlums claim that Dow Chemical’s duty to disclose arose because it possessed superior knowledge about the dangers of using silicone within the human body. Dow Chemical had no duty to disclose to the Mahlums any superior knowledge it may have had regarding the safety of silicone products, however, because it was not directly involved in the transaction from which this lawsuit arose, or any other transaction with the Mahlums. Accordingly, we conclude that the portion of the judgment holding Dow Chemical liable for fraudulent misrepresentation was not supported by evidence of any relationship between the parties and must be reversed.
D. Accessory Liability
The jury also found that Dow Chemical (1) aided and abetted Dow Corning to engage in fraudulent misrepresentation and (2) acted in concert with Dow Corning to commit fraudulent misrepresentation.[5]
The trial court’s jury instruction followed section 876 of the Restatement (Second) of Torts. The Restatement provides:
*1488 For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
(a) does a tortious act in concert with the other or pursuant to a common design with him, or
(b) knows that the other’s conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.
Restatement (Second) of Torts, § 876 (1979) [hereinafter section 876]. Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983), explains that subpart (a) of section 876 corresponds to civil conspiracy, and subpart (b) of section 876 corresponds to civil aiding and abetting. Id. at 477. We will review these theories separately[6].
1. Concert of Action
Under the Restatement, liability attaches for concert of action if two persons commit a tort while acting in concert with one another or pursuant to a common design. Section 876(a). The tort of concert of action has traditionally been quite narrow in the scope of its application. The classic application of concert of action is drag racing, where one driver is the cause-in-fact of plaintiffs injury and the fellow racer is also held liable for the injury. Santiago v. Sherwin-Williams Co., 794 F. Supp. 29, 31 (D. Mass. 1992), aff’d, 3 F.3d 546 (1st Cir. 1993). Similarly, one court remarked that application of the doctrine of concert of action “is largely confined to isolated acts of adolescents in rural society,” Halberstam, 705 F.2d at 489, and another court observed that this theory is meant to “deter antisocial or dangerous behavior.” Juhl v. Airington, 936 S.W.2d 640, 644 (Tex. 1996).
Concert of action resembles the tort of civil conspiracy. Halberstam, 705 F.2d at 477. “An actionable [civil] conspiracy consists of a combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for *1489 the purpose of harming another, and damage results from the act or acts.” Sutherland v. Gross, 105 Nev. 192, 196, 772 P.2d 1287, 1290 (1989). Civil conspiracy in Nevada differs from concert of action as defined in section 876 in that civil conspiracy requires that the defendants have an intent to accomplish an unlawful objective for the purpose of harming another, while concert of action merely requires that the defendants commit a tort while acting in concert.
Both causes of action require an agreement. To prevail in a civil conspiracy action, a plaintiff must prove an agreement between the tortfeasors, whether explicit or tacit. See Eikelberger v. Tolotti, 96 Nev. 525, 528 n.1, 611 P.2d 1086, 1088 n.1 (1980). Similarly, when section 876 refers to acting in concert with another tortfeasor or pursuant to a common design, it refers to this concept of agreement. See section 876(a), cmt. a; Halberstam, 705 F.2d at 477. Proof of an agreement alone is not sufficient, however, because it is essential that the conduct of each tortfeasor be in itself tortious. Section 876(a), cmts. b & c.
The Mahlums argue that the evidence shows that Dow Chemical had a ‘‘tacit understanding” with Dow Corning to engage in tortious conduct, namely, misrepresenting the safety of the silicone used in breast implants, withholding information regarding the adverse consequences of such silicone from physicians and patients, and providing Dow Corning with a global market for its silicone gel breast implants.
Assuming only for purposes of this discussion that Dow Corning did make fraudulent misrepresentations about silicone breast implants, we conclude that the Mahlums did not prove at trial that Dow Chemical acted in concert with Dow Corning by agreeing to commit fraudulent misrepresentation regarding silicone breast implants. The Mahlums failed to prove the existence of an agreement, tacit or otherwise, between Dow Chemical and Dow Corning in which they agreed to commit fraud regarding silicone breast implants, specifically, to make misrepresentations to physicians and patients about the safety of silicone breast implants. Dow Chemical’s few public statements about the potential safety of silicone cannot support an inference that Dow Chemical and Dow Corning had an agreement to misrepresent the safety of silicone breast implants. Accordingly, we conclude that the record lacks substantial evidence of Dow Chemical’s liability for concerted action to commit fraudulent misrepresentation, and the judgment must therefore be reversed on this cause of action.
*1490 2. Aiding and abetting
Under the Restatement, liability attaches for civil aiding and abetting if the defendant substantially assists or encourages another’s conduct in breaching a duty to a third person. Section 876(b). The Mahlums had to prove three elements: (1) that Dow Corning committed fraudulent misrepresentation that injured Mahlum; (2) that Dow Chemical was aware of its role in promoting the fraudulent misrepresentation at the time it provided assistance; and (3) that Dow Chemical knowingly and substantially assisted Dow Corning in committing fraudulent misrepresentation. See TMJ Implants, 113 F.3d at 1495; Halberstam, 705 F.2d at 477. The second and third elements should be weighed together, that is, greater evidence supporting the second element requires less evidence of the third element, and vice versa. TMJ Implants, 113 F.3d at 1495.
The Mahlums contend that certain evidence supports the verdict on their aiding and abetting claim. First, they assert that Dow Corning was aware of potential hazards regarding, or at least harbored doubts about, the safety of silicone gel breast implants, and allegedly made misrepresentations about those implants to Charlotte Mahlum. Second, they assert that the jury could infer that Dow Chemical was aware of Dow Coming’s alleged misrepresentations because (a) Dow Chemical representatives held four (of ten) seats — and later five (of fifteen) seats — on Dow Coming’s Board of Directors; (b) Dow Chemical conducted or supervised some tests on silicone substances for Dow Corning as late as 1970; (c) Dow Chemical’s chief toxicologist, Dr. V. K. Rowe, maintained a consulting relationship with Dow Corning from the late fifties until the early seventies regarding ¡ Dow Coming’s design, conduct, or interpretation of studies regarding silicone substances; (d) Dow Chemical and Dow Corning agreed to test the silicone later used in breast implants for use as pharmaceuticals and pesticides; and (e) Dow Chemical, through its subsidiary, Lepetit, marketed Dow Corning breast implants outside the United States. Finally, the Mahlums assert that Dow Chemical’s research of the pharmaceutical and pesticidal uses of liquid silicone, and its marketing of breast implants through its subsidiary outside the United States, “emboldened” Dow Coming’s alleged fraudulent misrepresentations regarding the safety of silicone gel breast implants.
We conclude that the verdict on the aiding and abetting claim cannot stand. The evidence does not establish that Dow Chemical knowingly and substantially assisted Dow Corning in committing *1491 a fraud. Even though, as discussed below in section E, the Mahlums established that Dow Chemical negligently performed its undertaking to test liquid silicone, the evidence that the Mahlums advance falls short of proving that Dow Chemical’s actions amounted to knowing support or encouragement of Dow Coming’s alleged fraudulent conduct. The difference between the failure of proof regarding aiding and abetting and the adequacy of proof regarding negligent undertaking lies in Dow Chemical’s failures to act, rather than its deeds. Here, the proof fails to show the necessary actions that would demonstrate Dow Chemical’s knowing participation in Dow Coming’s alleged fraud. By contrast, the evidence regarding negligent undertaking is present in the tests and cooperation regarding research that Dow Chemical undertook. In other words, the proof regarding Dow Chemical’s research activities does not support knowing participation in a fraud. The Mahlums thus failed to show that Dow Chemical rendered substantial assistance to allegedly fraudulent misstatements that Dow Coming may have made to Charlotte Mahlum.
The Mahlums argue that if Lepetit had refused to market breast implants without warnings, then Dow Corning would not have been emboldened to continue its supposedly false and misleading representations in the United States. The Mahlums’ assertion that Lepetit’s lack of protest somehow emboldened Dow Corning, thus providing it with substantial assistance, lacks support in the law. To amount to substantial assistance, such encouragement must take the form of a direct communication, or conduct in close proximity, to the tortfeasor. See Halberstam, 705 F.2d at 481-82 (suggestive words may be enough to create joint liability when they plant the seeds of action and are spoken by a person in an apparent position of authority). The Mahlums failed to prove the existence of direct communication from Dow Chemical to Dow Corning, or close conduct, that could have promoted a fraud. Accordingly, we reverse that portion of the judgment imposing liability on Dow Chemical for aiding and abetting fraudulent misrepresentations. In light of our reversal of the intentional tort claims, we also vacate the district court’s award of punitive damages.[7]
E. Negligent Performance of an Undertaking
In contrast to the fraud claims, substantial evidence in the record supports the verdict against Dow Chemical with respect to *1492 the claim of negligent performance of an undertaking. We therefore conclude that the judgment with respect to this claim must be affirmed. The trial court’s jury instruction was consistent with Restatement (Second) of Torts section 324A, which provides as follows:
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to perform his undertaking if
(a) his failure to exercise reasonable care increases the risk of such harm or
(b) he has undertaken to perform a duty owed by the other to the third person or
(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
Restatement (Second) of Torts section 324A (1979) [hereinafter section 324A], This section reflects the “Good Samaritan” doctrine.
The Mahlums contend that Dow Chemical effectively undertook to test completely and adequately the safety of the liquid silicone used in Dow Coming’s breast implants and negligently performed that undertaking. Dow Chemical asserts that it did not undertake to test the safety of Dow Coming’s silicone gel breast implants or the liquid silicone used therein. Dow Chemical maintains that the tests it performed for Dow Corning over a thirty-year period were unrelated to breast implants and that the other evidence relied on by the Mahlums to establish liability, such as the services rendered by Dr. Rowe, equally failed to demonstrate an undertaking. We disagree.
As an initial matter, Dow Chemical contends that the Mahlums must demonstrate that Dow Chemical undertook a duty with respect to the specific product (Silastic II breast implants) that caused Charlotte Mahlum’s harm. Section 324A, however, includes no such requirement. As the federal district court concluded in In re Silicone Gel Products Liability Litigation, 887 F. Supp. 1455, 1460 (N.D. Ala. 1995),
Dow Chemical’s reading of [section] 324A is too restrictive. That section provides that one who undertakes services on behalf of another assumes a duty to use due care. The proper focus of the inquiry is whether Dow Chemical undertook to perform services to Dow Corning that Dow Chemical *1493 should have recognized were necessary for the protection of third persons. The undertaking creates a duty that would not otherwise exist. Dow Chemical’s argument that liability for negligent undertaking can arise only as to a specific final product takes too narrow a view of negligent undertaking analysis. Liability can arise when it is reasonably foreseeable that another will be harmed by the failure to exercise reasonable care in performing such an undertaking.
In addition, Dow Chemical argues that the issue of whether it owed a duty to the Mahlums was improperly submitted to the jury by the district court. According to Dow Chemical, the issue of whether a duty existed in this case was a legal question that should have been resolved by the district court. Although “[t]he ‘precise nature and extent’ of [an alleged section 324A] duty ‘is a question of law ... it depends on the nature and extent of the act undertaken, a question of fact.’ ’ ’ Artiglio v. Corning Inc., 957 P.2d 1313, 1318 (Cal. 1998) (quoting Smith v. State, 921 P.2d 632, 634 (Alaska 1996)); accord Pratt v. Liberty Mut. Ins. Co., 952 F.2d 667, 671 (2d Cir. 1992). At trial, the following evidence pertained to the nature and extent of Dow Chemical’s undertaking: (1) Dow Chemical’s creation of and fifty percent ownership of Dow Corning, (2) Dow Chemical’s' control of one-third of Dow Coming’s board of directors, (3) Dow Chemical’s undisputed expertise in toxicology, (4) Dow Coming’s lack of a toxicology laboratory until 1968 and reliance on Dow Chemical’s toxicological expertise,[8] (5) the housing of Dow Chemical’s and Dow Coming’s toxicology laboratories in a Dow Chemical building from 1968 until 1971, (6) the myriad tests performed by Dow Chemical on silicone compounds and the specific tests relating to silicone fluids, (7) the continuing assistance rendered to Dow Corning by Dow Chemical personnel, and (8) Dow Chemical’s 1966 joint development agreement, 1969 information development agreement, and 1975 trademark agreement with Dow Corning. Accordingly, we conclude that the type and extent of Dow Chemical’s undertaking was properly and necessarily submitted to the jury. In other words, the jury was required to consider the nature and scope of Dow Chemical’s undertaking so that its concomitant duty, if any, could be determined. See Smith, 921 P.2d at 635.
*1494 The record before us reveals substantial evidence from which the jury could determine that Dow Chemical undertook to render services to test the safety of the liquid silicone later used in Dow Coming’s breast implants and that Dow Chemical should have recognized those services as necessary for the protection of third persons. Dow Chemical’s head toxicologist, Dr. V. K. Rowe, acted as a consultant to Dow Corning on matters concerning silicone toxicology from the late 1940s into the mid 1970s. Documents introduced at trial revealed that Dr. Rowe not only designed the testing protocol for some independent outside laboratories, but also acted as a consultant to Dow Coming’s Product Safety Committee in the late 1960s, after Dow Corning introduced its breast implants. Dr. Rowe testified that, in his capacity as an unpaid consultant to Dow Corning, he would render advice on the type of tests Dow Corning should conduct on its silicone substances, interpret the conclusions of such tests, and recommend any additional tests he deemed advisable. Dr. Rowe also attended, on Dow Coming’s behalf, meetings regarding product safety with personnel from outside laboratories that contracted with Dow Corning. In 1967, Dr. Rowe was one of the toxicology consultants who advised Dow Coming’s Product Safety Committee on breast implant studies performed on dogs. The evidence also suggested that Dr. Rowe indirectly played a role in setting up part of the test protocol for the 1967 dog study.
The evidence also revealed that Dow Chemical and Dow Corning exchanged important personnel between themselves as well as with Lepetit. For example, in 1968, Kenneth Olson transferred from Dow Chemical’s toxicology department to Dow Corning to head its new toxicology laboratory. Olson then returned to Dow Chemical in 1973 with the likely knowledge that silicone fluid was used in Dow Coming’s silicone gel breast implants. From 1964 to 1966, Charles Hinman, a scientist from the Pitman-Moore division of Dow Chemical, worked for Lepetit as its scientific advisor. While ostensibly a Lepetit employee, Hinman remained on Dow Chemical’s payroll. Lastly, R. William Caldwell, a Dow Corning employee, transferred in 1967 to Dow Chemical as its assistant general manager of bioproducts department. Shortly thereafter in 1968, Dow Chemical sent Caldwell to Lepetit, gave him the title of “administratore delegato,” and authorized him to buy, sell, and trade Lepetit without prior approval of Lepetit’s board. Caldwell testified that he viewed himself a Dow Chemical employee, despite the changes he underwent in employment.
Additionally, various documents chronicle Dow Chemical’s testing of Dow Coming’s silicone materials from the late 1940s *1495 into the mid-1970s.[9] Based on the Chenoweth study, Dow Chemical knew as early as 1956 that the silicone fluid DC 200 (the chemical equivalent of DC 360 fluid used in Dow Coming’s breast implants), when injected intramuscularly into rats, migrated throughout the body into major organs, including the brain. The Chenoweth study also specifically recognized that silicone fluids were being studied for medicinal purposes and sought to explore their biological activities. In 1957, Dow Chemical’s Dr. Rowe knew that the Miami study involving DC 200 fluid showed that the fluid lowered the granulocytic (immune) elements of the female test subjects’ blood. During the 1950s and 1960s, Dow Chemical knew that Dow Corning was marketing medical products containing silicone: catheters, brain shunts, heart valves, and drainage valves.[10] Also, in its annual report to stockholders in 1959, Dow Chemical noted that “[bjecause of their chemical inertness and lack of toxicity, silicone are rapidly finding use in medical research.” Thus, Dow Chemical was aware that many of the silicone substances being tested were destined for use in medical devices, including implants.
In 1970, after Dow Chemical began marketing Dow Corning breast implants outside of the United States through its subsidiary Lepetit, Dow Chemical’s pathologist Gary Sparschu found that experiments performed on rats injected with DC 360 fluid showed that the fluid had migrated to different parts of the body, including the bone marrow. The female test animals also showed decreased brain weights. Because Dow Chemical knew prior to the 1970s that other silicone materials developed for medical purposes were being used as implants, knew that liquid silicone was being developed for medicinal uses, and knew at the time of Sparschu’s tests that Dow Corning was using liquid silicone in its *1496 breast implants,[11] the jury could reasonably infer that Dow Chemical should have known that the services it rendered (e.g., its professional advice and protocol design by Dr. Rowe), the exchange of key personnel to and from Dow Corning, and its toxicological testing of Dow Coming’s liquid silicone, were a necessary step in the protection of third persons who would purchase liquid silicone in the form of breast implants. As Justice Mosk of the California Supreme Court explained in Artiglio,
[tjhat Dow Chemical acted without a focus on silicone breast implants does not negate the fact that it acted with a focus on silicone implants. Further, that it acted without awareness of plaintiffs as recipients of silicone breast implants does not negate the fact that it acted with awareness of the general class of persons to which plaintiffs belong, that is, recipients of silicone implants.
Artiglio, 957 P.2d at 1323 (Mosk, J., dissenting). Put another way, “[i]f Dow Chemical knew that its testing was being relied upon to develop products that would be implanted in humans, Dow Chemical had a duty to use due care in providing reasonably accurate and complete information even if it did not specifically know in which part of the body the products would be implanted.” In re Silicone Gel, 887 F. Supp. at 1461.
Further, based on the evidence before it, the jury could have reasonably determined that Dow Chemical’s undertaking went beyond the mere occasional testing of organosilicon compounds for Dow Corning. When Dow Chemical and Corning Incorporated created Dow Coming, they contributed technology and licenses that they held with respect to organosilicon materials. The evidence established that from its inception until the late 1960s, Dow Corning lacked a toxicology laboratory and relied, to a considerable extent, on Dow Chemical to perform necessary testing on the safety of its silicone substances and products. Dr. Rowe testified that in the 1950s, Dow Chemical’s toxicology laboratory had a well-respected ranking in the world. Dow Chemical knew that Dow Corning owed a duty to its customers to manufacture and market reasonably safe products. Dow Chemical also knew that Dow Coming lacked a toxicology laboratory until years after Dow Corning began to market breast implants. Additionally, Dow Chemical was aware that Dow Corning heavily relied on the expertise of Dow Chemical’s toxicologists, not only to conduct tests on the toxicology of silicone materials from Dow Corning, but also to interpret the test results and to design the testing pro *1497 tocol for outside laboratories with whom Dow Corning contracted. [12]
Moreover, Dow Chemical entered into several noteworthy agreements with Dow Corning, which further support the conclusion that Dow Chemical undertook to evaluate and test the safety of Dow Coming’s liquid silicone. The first was a 1966 joint development agreement “relating to the physiological effects from ingestion or injection into the systems of animals or men of particular physiologically active silicone.” By this agreement, Dow Chemical and Dow Corning agreed to “jointly share the costs and ... the profits and losses of any commercialization.’ ’ The second was a 1969 agreement between Dow Chemical, Dow Corning, and Lepetit pursuant to which the three companies agreed to develop “a body of technical information concerning the biological activity of certain organosilicon compounds.”[13] The agreement further noted that “it will be necessary for Dow [Chemical], [Dow Corning], and Lepetit to disclose to one another information in [this area] which is considered to be proprietary and confidential.” Neither agreement specifically mentions liquid silicone; nevertheless, as liquid silicone appears to fall within the class of physiologically active silicone and Dow Chemical did amass technical information on liquid silicone compounds, the jury could have reasonably inferred that such compounds fell within the scope of the agreements.
Finally, in 1975, Dow Chemical entered into a trademark and trade name licensing agreement with Dow Corning. Pursuant to this agreement, Dow Chemical agreed to allow Dow Corning to continue using, among other things, the trademark “Dow.” This agreement stated that “Dow Company and Corning Company formed [Dow Corning] in 1943 and since then have continuously owned or controlled equally all of the issued share capital of [Dow Corning], and have controlled its operations, including the quality of its goods and services.” This language is consistent with licensing requirements under the Lanham Trademark Act of 1946, 15 U.S.C. § 1051, to protect the mark’s integrity. If a licensor *1498 fails to exercise control over the licensed mark, it may forfeit the mark as abandoned. See generally J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 17:6, at 17-6 (4th ed. 1998). Additionally, courts have concluded that although a trademark licensor has a duty to inspect and maintain the quality of goods sold under a trademark license, this duty cannot result in tort liability. See, e.g., TMJ Implants, 113 F.3d at 1494; Mini Maid Servs. Co. v. Maid Brigade Sys., Inc., 967 F.2d 1516, 1520 (11th Cir. 1992). Nevertheless, even though this language in the trademark agreement, by itself, is not sufficient to create tort liability on Dow Chemical’s part, we agree with the federal district court that the agreement’s “existence is one factor in assessing Dow Chemical’s knowledge and involvement in Dow Coming’s breast implant activities.” In re Silicone Gel, 887 F. Supp. at 1461.
Based upon the aforementioned evidence, the jury could have found that Dow Chemical undertook to render testing, advisory, laboratory and personnel services for the purpose of promoting the safety of Dow Coming’s silicone fluid in order to benefit third persons and had significant control over the development of this fluid.
Because the jury could reasonably conclude that Dow Chemical undertook to completely test the safety of the liquid later used in Dow Coming’s silicone breast implants, Dow Chemical had a duty to exercise reasonable care in the performance of this undertaking. See section 324A. Comment b to section 324A explains that the section “applies to any undertaking to render services to another, where the actor’s negligent conduct in the manner of performance of his undertaking, or his failure to exercise reasonable care to complete it, or to protect the third person when he discontinues it, results in physical harm to the third person.’ ’ Thus, under section 324A, once Dow Chemical undertook to test and advise Dow Corning on the safety of liquid silicone, it was obligated to fully complete this course of conduct. Alternatively, if Dow Chemical discontinued its undertaking at some point, it was required to protect Dow Coming’s consumers.
Based upon the evidence adduced at trial, the jury was free to conclude that Dow Chemical failed to perform its undertaking with reasonable care, resulting in physical harm to Charlotte Mahlum. See Pratt, 952 F.2d at 671. The Mahlums assert that Dow Chemical negligently performed its undertaking by failing to either conduct further tests to determine the long-term effects of silicone in the human body or at least advise Dow Corning on the need for such studies. We agree and additionally conclude that Dow Chemical was negligent by failing to intervene in the mar *1499 keting of Dow Coming’s breast implants. Thus, we conclude that the evidence supports the jury’s finding of negligence.
Under the circumstances, once Dow Chemical undertook to test the safety of Dow Coming’s liquid silicone, it was required to fully complete this testing until a reliable safety determination was made. Charlotte Mahlum’s expert witness, Dr. Lappé, testified that Dow Chemical did not use reasonable care in designing and conducting follow up studies to confirm or reject results that suggested dangers. The record suggests that Dow Chemical did very little with respect to follow up, long-term testing. Dr. Lappé testified as follows:
My opinion is a very clear and forceful one that whatever long term testing they did do was inadequate. The results were misreported. The findings were suggestive of problems rather than safety. And in the aggregate, there was absolutely no basis for assuming long term safety based on the animal testing.
Given its knowledge about silicone in general and silicone gels in particular through its testing and advising on silicone fluids research over a thirty-year period, its involvement in and knowledge of breast implants through its controlled subsidiary Lepetit, its parent/subsidiary relationship with Dow Corning, including some control over Dow Coming’s products and significant control of testing and protocol, one-third control of Dow Coming’s board of directors, fifty percent control of Dow Coming’s shares, and the control inferred from its various agreements with Dow Corning, Dow Chemical should have used its influence to halt the marketing of Dow Coming’s silicone breast implants until the long-term effect of silicone breast implants on humans was understood and these products were determined to be safe.[14]
*1500 Furthermore, Dow Chemical could have acted directly under its 1975 trademark and trade name licensing agreement with Dow Corning. The agreement required that products using Dow Chemical’s name be “of a nature and quality that is acceptable to Dow Company and shall not damage or reflect adversely on the reputation or goodwill associated with the name and mark ‘Dow’ ” and that Dow Corning, if requested, submit specimens of its products to Dow Chemical and permit inspection of its premises to examine the quality of Dow Coming’s products. Additionally, pursuant to this agreement, Dow Chemical preserved the right to withdraw its consent to Dow Coming’s use of its name.
Aside from any actual control reflected by this agreement, the agreement gave Dow Chemical authority to revoke Dow Coming’s license to use the corporate name “Dow” on any questionable products. As Dow Chemical knew of the risks associated with DC 360, and was aware of specific problems that implant recipients had experienced through its subsidiary Lepetit, Dow Chemical should have exercised its power to revoke Dow Coming’s trademark and tradename license with respect to breast implants, if Dow Corning had refused to stop marketing these products.
Finally, given that Dow Chemical knew that much of the extensive and specific information it had of DC 200, DC 360, and other liquid silicone’ potential danger was not widely disseminated, it could have also published its knowledge of the potentially hazardous biological effects of liquid silicone. Such publication would have put the medical community on notice of the potentially significant dangers that could result from implantation. Unfortunately, Dow Chemical failed to take any of these actions. Instead, it continued to market Dow Corning breast implants outside of the United States and to reap the financial benefits of Dow Coming’s domestic sales. The jury could therefore reasonably conclude from these facts that Dow Chemical negligently performed its undertaking with regard to the safety of the liquid silicone subsequently used in breast implants, as it failed to corn- *1501 pletely test the silicone liquid for safety and failed to protect the third-party implant recipients.
The jury also had sufficient evidence to conclude that Charlotte Mahlum’s physical harm resulted from Dow Chemical’s failure to exercise reasonable care.[15] See section 324A (One who undertakes to render services that should be recognized as necessary for a third person’s protection “is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to perform his undertaking.”). As discussed above, the Mahlums introduced expert testimony which tended to prove that Dow Coming’s breast implants caused Charlotte Mahlum’s illnesses.
Obviously, had Dow Chemical acted to prevent Dow Corning from marketing its breast implants, either through direct influence or its trademark agreement, Charlotte Mahlum would not have suffered injuries from these implants. In addition, testimony at trial included the opinion of Charlotte Mahlum’s expert witness, Dr. Lappé, that had Dow Chemical publicized its knowledge of the dangers of liquid silicone to the scientific or medical community, efforts would have been made to stop the use of medical products containing liquid silicone until further tests established the safety of such products. Charlotte Mahlum also testified that had she known of the significant health hazard posed by liquid silicone, she would have refused Dow Coming’s breast implants.
It was foreseeable that proceeding with the marketing of silicone breast implants and failing to present any information regarding the potential dangers of silicone fluids would result in women electing to receive the implants without a full appreciation of the risks involved. Based upon the evidence adduced at trial, the jury could have found that Dow Chemical had a significant level of control over Dow Corning and its products. Dow Chemical certainly had the authority to influence Dow Corning and to assert direct pressure on Dow Corning through its trademark agreement. Dow Chemical, however, did nothing.
*1502 We previously discussed the nature of duty and potential section 324A liability in Wright v. Schum, 105 Nev. 611, 781 P.2d 1142 (1989). Wright recognized that a landlord could be liable, under section 324A, for injuries caused by a dog known to be vicious that escaped from the leased premises through an obviously broken gate. The Wright opinion recognized that “the mere advice or warning by one person to another that care should be taken to avoid a certain risk does not in itself create an undertaking and consequent liability on the part of one giving such advice.”[16] Id. at 616, 781 P.2d at 1145. We also emphasized in Wright that the landlord was not liable simply because he was the landlord; instead, the landlord had intended to and did influence the conduct of his tenants by threatening to evict them unless they kept the dog in the house or on a chain. Id. at 616-17, 781 P.2d at 1145. Nevertheless, this court noted that the landlord’s status as a landlord created the general liability under section 324A. Id. at 616 n.2, 781 P.2d at 1145 n.2. Specifically, since the landlord had the power to enforce his demand that the tenant take care of the dog, and used this power, he undertook a duty to exercise due care and could be found liable for his breach of this duty. Id. at 617, 781 P.2d at 1145-46.
Here, as in Wright, Dow Chemical’s duty and resulting liability is not based solely on its status as a parent corporation. By virtue of its status as a creator parent, however, Dow Chemical had a degree of power over Dow Corning. As has been previously mentioned, Dow Chemical maintained fifty percent ownership of Dow Coming’s stock and one-third control of Dow Coming’s board of directors. Dow Chemical also tested and advised Dow Corning on its silicone products for several decades. During most of this time, Dow Corning lacked its own toxicology lab, and Dow Coming’s Bioscience Research Department was located within the same building as Dow Chemical’s toxicology and research laboratories from 1965 until 1970. Dow Chemical designed testing protocol and exercised influence in the area of toxicology, and, over the years, Dow Chemical freely transferred its employees .to and from Dow Corning. Further, Dow Chemical entered into a 1966 joint development agreement, a 1969 information development agreement, and a 1975 trademark agreement with Dow Corning. These agreements could support a finding by *1503 the jury that Dow Chemical was exercising actual control over the development of information and silicone products. The record is also replete with examples of Dow Corning following Dow Chemical’s lead; in fact, our review of the record discloses no instance when Dow Corning failed to act in accordance with Dow Chemical’s instruction. Consequently, we conclude that substantial evidence of Dow Chemical’s control over Dow Corning, as required by Wright, was presented to the jury.[17]
As a last requirement under section 324A, the Mahlums needed to show one of three things: (a) that Dow Chemical’s negligence increased the harm to them, (b) that Dow Chemical undertook a duty owed by Dow Corning to them, or (c) that either Dow Corning or they relied on Dow Chemical’s undertaking.[18] We con- *1504 elude that, based upon the evidence discussed above, the jury could conclude that Dow Chemical undertook at least part of the duty, owed to the Mahlums by Dow Corning, to reasonably ensure the safety of breast implants. Additionally, substantial evidence supports a determination that Dow Corning relied on Dow Chemical to inform it not only of the significance of findings such as silicone migration, but also to inform it of what additional tests or studies were required based upon such findings. Because Dow Corning lacked a toxicology department until 1968, six years after Dow Corning began to sell breast implants, the jury reasonably could have found that Dow Chemical undertook part of Dow Coming’s duty to its customers, and that Dow Corning relied on Dow Chemical’s tests and expertise in developing its silicone breast implants. Thus, we conclude that liability under subsections (b) and (c) of section 324A is supported by substantial evidence in the record.
In sum, the record includes substantial evidence on which a reasonable jury could find that Dow Chemical was liable under section 324A for negligently undertaking its duty to completely test the safety of liquid silicone later used in breast implants and/or to warn recipients of the risks involved with these implants. Consequently, the judgment is affirmed on this cause of action.
F. New Trial Issues
Dow Chemical also appeals from a number of rulings that purportedly require us to remand this case to the district court for a new trial. A new trial may be granted for: (1) irregularity in the proceedings of the court, jury, master, or adverse party, or any order of the court, or master, or abuse of discretion by which either party was prevented from having a fair trial; (2) misconduct of the jury or prevailing party; (3) accident or surprise which ordinary prudence could not have guarded against; (4) newly discovered evidence material for the party making the motion which *1505 he could not, with reasonable diligence, have discovered and produced at the trial; (5) manifest disregard by the jury of the instructions of the court; (6) excessive damages appearing to have been given under the influence of passion or prejudice; or, (7) error in law occurring at the trial and objected to by the party making the motion. NRCP 59(a). The standard of review for granting or denying a motion for a new trial is abuse of discretion. See Hazelwood v. Harrah’s, 109 Nev. 1005, 1010, 862 P.2d 1189, 1192 (1993).
Dow Chemical cites numerous issues for which it argues it deserves a new trial: (1) whether the district court erred in allowing Dr. Lappé to testify concerning Dow Chemical’s legal duties; (2) whether the district court erred in admitting evidence concerning silicone that are not contained in breast implants and in excluding evidence of the safe uses of silicone; (3) whether admission of a memorandum concerning the fatal effect of silicone on cockroaches constituted reversible error; (4) whether the district court erred in admitting the joint defense agreement between Dow Chemical and Dow Corning; (5) whether the district court erred in admitting evidence of a 1984 jury verdict against Dow Corning; (6) whether the district court erred in admitting internal Dow Corning documents that Dow Chemical had never seen; (7) whether evidence regarding Dow Chemical’s subsidiary, Lepetit, should have been excluded; (8) whether it was reversible error for the court to exclude evidence concerning Dow Chemical’s profits or lack thereof from the sale of breast implants; (9) whether the district court erred in striking Dow Chemical’s deposition designations; (10) whether the Mahlums’ trial counsel engaged in misconduct; (11) whether the district court improperly deprived Dow Chemical of its right to the counsel of its choice; and (12) whether the district court erred in instructing the jury. Dow Chemical also contends that the compensatory damages were excessive. Five issues are more troubling than the others and merit discussion below. The balance of the issues not discussed here are rejected as moot or lacking merit.
Dow Chemical maintains that the district court erred by introducing into evidence a 1984 jury verdict of fraud against Dow Corning in a breast implant case (the Stern verdict). The Mahlums argue that this evidence was relevant for notice because in 1984, one year before Mahlum received her breast implants, Dow Chemical, through its representation on the Dow Corning Board of Directors, received notice of the harmful effects of silicone breast implants and did nothing. Although Dow Chemical argues that the Mahlums’ notice theory is inconsistent with its fraudulent concealment claim (because fraud is an intentional *1506 act), we conclude that mere inconsistency should not render mention of the Stern verdict inadmissible. Mention of the Stern verdict was fairly brief, and was offered to prove notice rather than to convince the jury that it should render a similar verdict. Admitting a prior verdict as evidence, however, is a practice that we condemn as generally highly prejudicial. A district judge who admits such evidence risks reversal under NRS 48.035. But in this particular instance, we are not convinced that unfair prejudice outweighed thé probative value of a few brief references to the Stern verdict at this trial. We therefore conclude that mention of the Stern verdict is not a sufficient basis for remanding this case for a new trial.
In addition, Dow Chemical sought unsuccessfully to introduce evidence of the safe uses of polydimethylsiloxane silicone used in such devices as hydrocephalic brain shunts and heart valves. Dow Chemical maintains that the jury was thus prevented from hearing deposition evidence concerning the safe and beneficial uses of silicone in medical applications. The district court excluded Dow Chemical’s deposition designations as untimely under the court’s pretrial orders. At trial, the district court permitted Dow Chemical the opportunity to admit some of the previously excluded evidence where Dow Chemical could show that such evidence was critical to its defense. We conclude that the district court acted within its discretion in excluding the designations as untimely. See NRCP 16(b); NRCP 37(b)(2)(B); Kelly Broadcasting v. Sovereign Broadcast, 96 Nev. 188, 192, 606 P.2d 1089, 1092 (1980).
Further, Dow Chemical attempted to exclude evidence of tests purporting to show the toxicity of silicone compounds other than those used in Dow Coming’s breast implants. The district court admitted this evidence on the ground that it was relevant to the Mahlums’ aiding and abetting and conspiracy claims. According to the Mahlums, this evidence is relevant because the two companies’ cooperation in testing silicone compounds shows the close relationship between them. The decision to admit or exclude relevant evidence, after balancing the prejudicial effect against the probative value, is within the sound discretion of the trial judge, and the trial court’s determination will not be overturned absent manifest error or abuse of discretion. See NRS 48.035; K-Mart Corporation v. Washington, 109 Nev. 1180, 1186, 866 P.2d 274, 278 (1993). Evidence of such silicone compounds was material to the elements of the claims of accessory liability. Admission of the evidence regarding silicone compounds was therefore properly within the discretion of the district court.
*1507 Dow Chemical also assigns as error the district court’s decision to admit a joint defense agreement between Dow Corning and Dow Chemical. Dow Chemical sought a motion in limine to exclude any reference to a 1992 joint defense agreement between Dow Corning and Dow Chemical concerning any silicone breast implant litigation. One of Dow Chemical’s attorneys, during the cross-examination of the Mahlums’ witnesses, stated that it was a Dow Corning attorney who had conducted the witness’ deposition. Because this remark by Dow Chemical “opened the door,” the district court admitted the joint defense agreement into evidence. Dow Chemical argues that the jury could easily misconstrue the significance of the joint defense agreement and conclude that it was jointly responsible for any breast implant injuries. Dow Chemical also contends that the district court erred in not offering a limiting instruction that would have informed the jurors that they were not to draw any negative inferences from the joint defense agreement. We conclude that the district court erred in admitting the joint defense agreement based on a passing reference to Dow Coming’s participation in the earlier stages of this case. Although the admission of the joint defense agreement was unjustified, we conclude that its admission was harmless error, see NRCP 61, and not a sufficient basis for remanding this case for a new trial, because it was apparent at trial that Dow Corning had participated in earlier stages of the litigation and that Dow Coming’s and Dow Chemical’s interests were related.
Dow Chemical contends that the district court erred in refusing to allow two Dow Corning attorneys, who were not members of the Nevada bar, to represent Dow Chemical at trial pro hac vice. The district court refused to permit them to represent Dow Chemical because their proposed representation of Dow Chemical would conflict with their duties to Dow Corning. A district court has inherent power to enjoin an attorney from representing conflicting interests. Boyd v. Second Judicial District Court, 51 Nev. 264, 268, 274 P. 7, 8 (1929). When a district court must decide whether an attorney’s conflicts of interest should preclude representation, any doubt should be resolved in favor of disqualification. See Cronin v. District Court, 105 Nev. 635, 640, 781 P.2d 1150, 1153 (1989).
Dow Chemical had filed a cross-claim against Dow Corning; hence, the interests of the two companies were plainly adverse. Shortly before trial, citing the conflict of interest with Dow Corning, the district court denied Dow Chemical’s request to designate two attorneys, Nancy Lawson and John Donley, who had formerly represented Dow Corning in breast implant litigation. *1508 Dow Chemical failed to inform the court in timely fashion that Dow Corning had granted permission to permit Ms. Lawson to represent Dow Chemical, in a letter dated May 24, 1995.[19] (It appears that Dow Corning did not specifically consent to have Mr. Donley represent Dow Chemical at trial.) Dow Chemical apparently did not submit the letter waiving the conflict to the court until September 29, 1995, the same day that the court ruled that Nancy Lawson could not serve as Dow Chemical’s counsel because of the conflict of interest.
Dow Chemical maintains the district court abused its discretion in denying Dow Chemical its counsel of choice. According to Dow Chemical, it was severely prejudiced at trial by relying on counsel that were substantially less well prepared for certain critical tasks than its attorneys of record. The Mahlums argue that both attorneys had conflicts of interest and that neither of them produced timely proper evidence of Dow Coming’s consent to dual representation.
While Dow Chemical had a letter from Dow Corning waiving any conflict that might arise from Ms. Lawson’s representation of Dow Chemical at trial, Dow Chemical did not present that waiver to the court in a timely fashion, and apparently presented no waiver regarding Mr. Donley. Under these circumstances, the district court did not abuse its discretion in refusing to permit the Dow Corning attorneys to represent Dow Chemical at trial.
IV. Conclusion
In conclusion, we reverse the district court’s judgment on the claims of fraudulent concealment, concert of action, and aiding and abetting. Consequently, we also vacate the award of punitive damages. We affirm the judgment on the claim of negligent undertaking, and we affirm the district court’s order denying Dow Chemical’s motion for a new trial.

Although Dow Chemical also purports to appeal from the district court’s order denying its alternative post-judgment motion for judgment notwithstanding the verdict, we have previously explained that no appeal may be taken from an order denying a post-judgment motion for judgment notwithstanding the Verdict. See, e.g., Uniroyal Goodrich Tire v. Mercer, 111 Nev. 318, 320 n.1., 890 P.2d 785, 787 n.1. (1995).

There is conflicting evidence in the record regarding when Dow Corning began marketing its breast implants. While Dow Chemical maintains that initial sales began in 1964, testimony at trial suggested that Dow Corning began profiting from breast implants in 1962.

We have considered Dow Chemical’s argument that this court should adopt the decision of the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), regarding the admissibility of scientific evidence. The interpretation of a federal counterpart to a Nevada rule of evidence may be persuasive, but is not controlling. See Dougan v. Gustaveson, 108 Nev. 517, 835 P.2d 795 (1992). We believe that the Daubert doctrine is a work in progress, and that we should observe the doctrine’s further development in the federal courts before concluding that Daubert should be adopted as the law of this state. Above all, we do not presently perceive a need to adopt Daubert, based on our perception of developments in Nevada law, and we therefore decline to do so.

We have no way of knowing what the outcome would have been had Dow Corning been present at trial. Neither the judgment in this case nor this decision should foreclose Dow Corning from a full and fair trial on the merits if the Mahlums continue to press their claims after Dow Corning emerges from bankruptcy.

Dow Chemical contends that reversal is warranted because this court has never recognized a civil cause of action for aiding and abetting or concert of action. We disagree. The fact that this court has not previously recognized a cause of action will not warrant reversal where that claim is well grounded in the common law. See NRS 1.030 (providing that common law shall be the rule of decision in Nevada courts unless “repugnant to or in conflict with . . . the constitution and laws of this state”). Our review suggests that the two theories under consideration here, while limited in scope, are well grounded in common law. See, e.g., Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983); W. Page Keeton et al., Prosser and Keeton on Torts 322-24 (5th ed. 1984).

Although the jury was instructed consistently .with Restatement section 876(c), the verdict form did not refer to a separate claim under 876(c), but asked whether Dow Chemical was liable for concert of action and/or aiding and abetting. Even though the jury received instruction on section 876(c), we reject liability under that section because, as discussed infra, we conclude that there was no substantial assistance.

Accordingly, the Mahlums’ cross-appeal with respect to post-judgment interest on punitive damages is moot. See NRS 42.005; Wichinsky v. Mosa, 109 Nev. 84, 847 P.2d 727 (1993).

A Dow Corning scientist testified that Dow Corning relied on outside consultants, such as Dow Chemical, to interpret toxicology results. Thus, although Dow Chemical argues that it did not perform any tests negligently, the jury could have determined that Dow Chemical was negligent for not fully advising Dow Corning on the meaning of certain test results.

Dow Chemical correctly points out that most of the toxicological tests it performed for Dow Corning fell under the heading of industrial handling tests. The evidence, however, also showed that Dow Chemical freely offered Dow Corning advice on the safety of the products containing the tested materials. For example, Dow Chemical counseled Dow Corning to include a safety warning on a hair conditioner and to conduct further tests on a silicone material used in foot ointment before marketing it. Further, even though the majority of Dow Chemical’s tests related to industrial handling, it is undisputed that Dow Chemical was involved with testing liquid silicones for purposes other than industrial handling. That Dow Corning relied on Dow Chemical’s toxicological expertise was testified to at trial by former Dow Corning employees, who believed, in the 1950s and the 1960s, that Dow Chemical scientists were the “experts” on silicone toxicology.

“This information is partially contained in Dow Chemical’s 1959 annual report to its stockholders. A Dow Chemical physician also wrote several articles in the early 1960s on various silicone catheters and tubes made by Dow Corning.

 The jury heard evidence from Dr. Rowe that he was aware Dow Corning was using liquid silicone in its breast implants; this information can also be inferred from his involvement in the 1967 miniature implants study in dogs.

Dr. Rowe’s testimony and other evidence in the record confirmed that he rendered these services for Dow Corning from the 1940s into the 1970s. Dr. Rowe designed the testing protocol for the 1957 Miami study conducted by Professor Deichmann. He also was consulted on the 1967 dog implant study conducted by an independent laboratory. On the topic of reliance, evidence in the record showed that even in the 1980s, Dow Corning was relying on the 1948 article written by Dr. Rowe for the proposition that silicones were generally inert.

Although William Caldwell, a Dow Chemical and Lepetit employee at various times, testified that this agreement pertained to pharmaceutical research, the jury could conclude that this agreement was broad enough to encompass liquid silicone.

Dow Chemical obtained a majority interest in its Italian subsidiary Lepetit in 1967 and eventually owned more than ninety-nine percent of the company. Through this company, Dow Chemical marketed Dow Corning breast implants outside the United States. As mentioned above, R. William Caldwell, who was Assistant Director of Dow Chemical’s Bioproducts Division, testified that he became the “Administore Delegato” of Lepetit. This title gave him the right to buy, sell or trade Lepetit. Additionally, Caldwell testified that even during his tenure at Lepetit, he considered himself a Dow Chemical employee.
Although Dow Chemical’s heavy involvement in Lepetit and its breast implant marketing activities does not affect our analysis of the scope of Dow Chemical’s undertaking, this evidence does suggest that Dow Chemical had significant knowledge about Dow Coming’s breast implants and additional problems associated with them. For instance, in 1971, Lepetit prepared a laboratory report evaluating the pharmacological effects of some silicone components due to reports that some silicone compounds have potential depressant activity on the central nervous system of mammals. This report was *1500 copied to Charles Hinman, then assistant director of Dow Chemical’s corporate research and development department as well as the director of Dow Chemical’s chemical biology research laboratory responsible, in part, for pharmaceutical research. Additionally, the record shows that during 1973 and 1974, Lepetit received numerous reports from physicians complaining about ruptures and other problems of Dow Coming’s Silastic breast implants. Given that Lepetit was virtually a wholly-owned subsidiary of Dow Chemical, and the evidence suggesting a high degree of control by an individual who reported directly to Dow Chemical, Lepetit’s knowledge of consumer complaints regarding Dow Coming’s breast implants can be imputed to its parent corporation. This evidence further supports a finding that Dow Chemical was aware that it needed to act to protect implant recipients.

Dow Chemical is not immune from liability based on the mere fact that Dow Corning did not introduce its silicone gel breast implants until 1962, several years after the Chenoweth and the Miami studies were done. Neither is Dow Chemical absolved from liability because the injuries to Mahlum occurred in the 1990s, when Dow Chemical had ceased performing any tests for Dow Coming’s silicone materials. The consequences of a negligent defendant’s act under section 324A may come to fruition many years after its undertaking has ended, and still the courts have found that liability may exist. See, e.g., Deines v. Vermeer Mfg. Co., 752 F. Supp. 989 (D. Kan. 1990), aff’d, 969 F.2d 977 (10th Cir. 1992) (holding that defendant insurance company that no longer insured the manufacturer could be held liable for injuries caused by a hay baler machine built in 1978 based on a 1974 design safety-inspected by defendant).

The justices dissenting to this opinion’s conclusion on negligent undertaking posit that this language from Wright cuts against any emphasis we place on Dr. Rowe’s status as a consultant. By making this assertion, they misconstrue our analysis and conclusion. Wright explains that mere advice, in and of itself, cannot create section 324A liability. We do not even remotely propose that Dr. Rowe’s actions, considered alone, would implicate section 324A. Dr. Rowe’s role as a consultant is one of many factors that the jury assessed in determining the scope of Dow Chemical’s undertaking.

As stated above, we do not suggest that negligent undertaking liability could be imposed on Dow Chemical merely because of its parental relationship with Dow Corning. We also do not imply that liability for negligent undertaking could be imposed on Dow Chemical merely because, at various times, it tested precursor components and the main component of the gel in Dow Coming’s Silastic breast implants. A consultant performing tests on components for a customer has a duty only to reasonably fulfill such duties as contemplated by the parties under their agreement. Here, however, we must emphasize that Dow Chemical’s involvement with and control over Dow Corning and its development of breast implants far exceeded that of a mere consultant. We disagree with our colleagues’ characterization of this opinion as working mischief and having “far reaching implications” on Nevada jurisprudence. Our analysis of section 324A does not create an “everlasting duty” and “infinite liability” for consultants who perform limited testing or merely provide expertise and advice. As we have explained, the Mahlums’ proffer of evidence indicated and suggested that Dow Chemical had significant control of Dow Corning. This evidence of control has led us to conclude that Dow Chemical’s undertaking, and correlative duty, transcended that which would normally be attributed to an independent consultant.
Additionally, we wish to point out that Dow Chemical’s duty as a “good Samaritan” is not unlimited. We are well aware of the troubling issues regarding the scope of Dow Chemical’s duty. See, e.g., Matter of New York State Silicone Breast Implant Litig., 632 N.Y.S.2d 953, 956-57 (Sup. Ct. 1995) (noting that if it were to hold that Dow Chemical assumed a duty of care to all potential consumers of silicone products, “the duty imposed on Dow Chemical would be indeterminate and infinite”), aff’d, 642 N.Y.S.2d 681, appeal dismissed, 676 N.E.2d 493 (N.Y. 1996). We need not view the scope of Dow Chemical’s duty as reaching all potential consumers of silicone products. We conclude only that Dow Chemical undertook to completely and accurately test the safety of the silicone liquid that was subsequently used in breast implants. In light of this undertaking, Dow Chemical owed a duty of care to breast implant recipients.

Dow Chemical asserts that in order for reliance to be proven, Dow Corning needed to forego all other remedies related to the safety of liquid silicones, such as testing by other laboratories on liquid silicones or the breast implant product itself. Dow Chemical’s approach is too restrictive. In Canipe v. National Loss Control Service Corp., 736 F.2d 1055 (5th Cir. *1504 1984), an injured machine operator brought an action for personal injuries against a corporation which had contracted with the injured operator’s employer to provide safety inspections and other accident-prevention services in the injured operator’s workplace. In addressing a similar argument by the defendant corporation that a prerequisite of liability was that the employer had foregone any other safety precautions other than those provided by the defendant, the Fifth Circuit Court of Appeals rejected the defendant’s argument and held that “an employer’s partial reliance on the defendant’s undertaking will suffice to trigger subsection (c) [of Restatement section 324A].” Id. at 1063. In short, the Mahlums need not have shown that Dow Corning completely abandoned all other safety tests or inspections in reliance on Dow Chemical’s undertaking.

Dow Chemical had submitted affidavits from the attorneys stating that Dow Corning had given its permission, but had not submitted evidence of direct permission from Dow Corning. The district court properly insisted on a letter from Dow Corning before it would consider permitting the representation.